Our next case this morning is Jennifer Lam-Quang-Vinh v. Springs Window Fashions. Mr. Olson, good morning. Good morning. May it please the court. Jeff Olson, I'm here for Jennifer Lam, we call her. In 2018, the country responded to an array of injuries inflicted by China by imposing punitive tariffs on Chinese goods. You don't have to agree with those policies to see that the law is only going to function if American companies comply with it in good faith. Jennifer Lam tried to get her company, Springs Window Fashions, to comply with the law. She ran into a lot of roadblocks. There are two parts to this case. One is pre-termination mistreatment. The other one is termination. I've got a minute on pre-termination mistreatment. It's true that there were just a handful of instances of mistreatment that were explicitly connected to the tariff issue. Youngblood's meetings with Lam as her supervisor and the September 18th meeting at which he angrily berated her in front of the senior leadership team. But it's every time that Youngblood interacts with her that he's losing his cool over this tariff issue. Mr. Olson, can I stop you there? I'm grateful that you started there. I have a question about that. In your reply brief, you say that Ms. Lam suffered repeated persecution, as you put it, at the hands of the CEO. And then in your main brief, you say that the CEO lit into Lam on the tariff issue every chance he got. But the only thing that I see in the record are the statements that, is it Youngblood? Youngblood. Youngblood. That Youngblood made at that September 2019 meeting. It's also the three meetings that they had when he was her direct supervisor over the summer of 2019. Okay. And does the record show what you characterize as her being berated at those three meetings? Yes. Okay. Where? The record shows. Where in the record? In her declaration, she talks about how in those meetings he became increasingly focused on the tariff issue and increasingly frustrated, expressing himself, expressing his great displeasure with her position. Those are June 2019? June through August. That was the period he supervised her directly after Nago left and before Oliver became her supervisor. The record shows that Oliver became chief financial officer in August of 2019 but didn't become Lam's direct supervisor until September of 2019. I think it's also significant that Youngblood is the top guy so that when he yells at her about her position on the tariff, she's got no one else to turn to. Everybody else is also his subordinate. So I think although there are just a few of those instances, there are enough to make the case for actionable retaliation. But if you add in, as I think we're entitled to do on summary judgment, Oliver's November 26, 2019 statement that you're not going to be here in five years. And if you add in the performance improvement plan, then I think you've got more than enough to meet a campaign of pre-termination mistreatment that amounts to actionable retaliation. Let's go to the termination. It's clear on the record that Youngblood, the CEO, was highly motivated to replace Lam with someone who would tell him that he did not have to pay the tariffs. So to defend the case, Springs has to, number one, separate Youngblood from the termination decision. And number two, separate Oliver from the tariff issue. And they try to do that but they can't do it. If you look at the September 18, 2019 senior leadership team meeting at which Youngblood angrily berates Lam about the tariff issue in front of the senior leadership, Oliver had to be there. He was, at that point, the newly appointed chief financial officer reporting directly to Youngblood. That's senior leadership team. If you look at the performance improvement plan that Oliver issues in December of 2019, the second part of that is criticism of Lam for inadequate support of business objectives. And in context, it's clearly about the tariff issue because there's nothing else where there's a record of Lam having any difficulty or disharmony with her bosses. But that says, you know, you're not customer focused. You're not looking at a risk analysis on this tariff issue. You're just telling us to obey the law and we need more than that. Is it your position that this verbal abuse, as you characterize it, that she suffered is independent retaliatory conduct separate and apart from her firing the performance improvement plan and her firing as an actionable retaliatory act? Or is it just part of the fact pattern for the firing? Our position is that she does have actionable retaliation based on the pre-termination mistreatment. And that that pre-termination mistreatment also helps to paint a picture that, as the court's precedents say, the light most favorable to the plaintiff lead to a conclusion by a reasonable jury that she was terminated because of her stand on the tariffs. The performance improvement plan is a big building block in that case because it's clearly focused on her handling of the tariff issue and telling her that they don't like the way she's been doing it. And the gold letter also shows that Youngbluth and Oliver were on the same page about Lamb and her tariff positions because, although it's addressed to Oliver, it's clear in the record that Oliver and Youngbluth discussed it and that they were both frustrated by it. Hold on, hold on, hold on. Sure. Oliver was frustrated by the tariff issue? He was frustrated by Gold's letter that explained Lamb's history on the tariff issue. And I think I'll save the rest of my time if I may. That's fine. Thank you. Ms. Brook. Good morning. May it please the court. My name is Amy Brooks. I know it's spelled unusually, but I usually have to pronounce it for people. And I and my colleague, Kurt Ellison, we represent the Appellee Springs Window Fashions. I'd like to start the argument to address the question that was just asked about whether or not these so-called pre-termination mistreatment events can independently, without anything more, form the basis for a pre-termination retaliation claim. And they can't. And here's why. The plaintiff cites in her brief to the Burlington Northern case, the United States Supreme Court's case. The reason why that case doesn't apply is because Burlington Northern was interpreting Title VII, and Title VII has separate discrimination provisions compared to retaliation provisions. The retaliation provision in Title VII is set forth in 42 U.S.C. 2000E-3A, and it doesn't have any reference to terms and conditions of employment. In comparison, the discrimination provision of Title VII, which is 2A of section 2000E, does have the terms and conditions language in it. So when the Burlington Northern court decided that to show retaliation there didn't have to be a link to the terms and conditions of employment, it was because the statute was worded differently. Here we have the False Claims Act, and it has terms and conditions language in it. And so it looks like, and it actually doesn't have the word retaliation in it. It says that a plaintiff must prove that she was discriminated against in the terms and conditions of employment because of lawful acts. And so therefore that language tracks much more like Title VII's discrimination provision instead of the retaliation provision. And that's why there's a difference. So the Burlington Northern case said, well, we don't have to tie it to employment at all, but that's not what we have here. We have the False Claims Act, which requires it to be tied back to the terms and conditions of employment. So after comparing those two sections, it can be seen that the relevant, what is relevant is that the cases aren't directly applicable, but the cases that interpret the discrimination provision of Title VII are what this court should look at in deciding whether or not those pre-termination events are by themselves without more retaliatory. And you're referring to the hostile work environment cases? That's correct. So hypothetically, under 3730H1, that's the provision we're talking about? Correct. So if we just hypothesize a circumstance where the harassment was so severe that were it gender, race, or something else, we were in the Title VII context. Correct. And I stipulated that it crossed the hostile work environment threshold. Correct. You would say in that hypothetical, it's actionable. Well, in that, but consistent with cases like this court's decision in Scruggs, I didn't bring my notepad over. Just let me grab it. I'll get that. Sorry. For it to be harassment, it would have to satisfy the well-developed standard that this court has decided in cases such as Scruggs v. Garst Seed Company, that's 587F3-832, that the harassment must be sufficiently severe or pervasive to alter the conditions of employment. So that's where it comes back to altering the terms and conditions of employment. There's no actual, those pre-termination events that are attributed to Mr. Jungbooth, there's no impact on her employment whatsoever. No actual material impact, which is what is required. So then I would like to just briefly address a couple of the facts, coming back to Judge Crabb's appropriate application of the summary judgment standard. And it would be too difficult to address all the facts, but I would like to address a couple of keys. So first of all, other than making logical leaps without connecting evidence, what the plaintiff has asked is that the court say that an inference could be raised because of these pre-termination acts. But to do that, the judges would have to conclude that Tim Oliver himself, who was the supervisor who started in September, that he himself held some retaliatory intent. There's no evidence of that. Or that Jungbooth leaned in on Oliver's decision to issue the PIF or the termination decision to Ms. Lamb. There's no evidence of that. Or that Jungbooth himself wanted Lamb disciplined for her stance on one country of origin issue. Why isn't it fair, though, for Mr. Olson to argue, we know that the tariff issue was still in play when the PIF came along. In other words, it didn't go away when the general counsel, John Comerford, in October of 2019 said the issue's dead, right? It's resolved that way. We know it's still in play when the PIF comes along because it's mentioned in there. But it's not mentioned to say that you reached the wrong conclusion. No, fair enough. But it's looking back at her performance and it's saying the way you handled the tariff issue was deficient. Okay, so my point is that when the inventory issue, which predominates, I'll give you that, when the inventory issue arises, why isn't it fair, as I think Mr. Olson is arguing, to allow a jury to conclude what influence, if any, if any, the lingering tariff issue may have had in the termination? Because I think his point is that Oliver could have concluded, I've had it. She's been a pain on the tariff issue and now she just blew the inventory issue and she's out of here. Because the PIP is in the record and it's not that specific as to this particular customs issue, this one country of origin issue. He doesn't say. I'm reading it right now. It relates to her performance overall as a customs person and how she communicates with business leaders to, for example, there was a question of are you advising the business people as to whether or not we can just change prices or is there some variation of this? So his was focused in on the communication. He said he didn't believe it was related to the country of origin issue for the Tayor fabric. That's what the record reflects. And I do want to correct one point. I believe I heard Mr. Olson say that there was evidence that Mr. Oliver was in the angrily berated meetings because he was an executive, so therefore he must have attended. There's no evidence in the record to support that. So the two facts I would like to address are Jennifer Sharkey. So Sharkey's, the evidence related to her in some sense fails in the same way that Jennifer Lamb's case fails, in which case Sharkey submitted an affidavit which said I missed a regulatory issue. That was in September of 2018. I was written up for missing that regulatory issue in October of 2018, and then Chris Nagel, my supervisor, said I was getting a write-up for it and I disagreed with it and that the write-up was directed by Mr. Jungbluth. The problem is is that there's no evidence that Sharkey's write-up was because of a stance she had taken on the Tayor fabric issue, and the plaintiff could have conducted Nagel's deposition. He's a former employee, no axe to grind, no skin in the game. She didn't. She could have conducted Jennifer Sharkey's deposition. She didn't to try to close that link. So instead we have one declaration that is the Sharkey's declaration is based on somewhat speculation, and then they're trying to use that even though there's no proof that that was issued because of a position she took on a tariff issue. And so those are the undisputed facts in the record. The Sharkey declaration is at 36-3 of the docket. And then one additional point, and it relates to Lamb's argument that somehow we're taking the position that unless she has smoking gun evidence, she doesn't have a case. That's not the position we're taking. We're saying she still has to come forward with actual evidence to support her conspiracy theory that Jungbluth leaned in on Oliver to drive these decisions. And that's another situation where the plaintiff could have done more. The plaintiff could have conducted the depositions of Kyler Cunningham and Andrew Hubert, the other participants in these alleged meetings, and she did not. And so it's not as though she looked for the evidence and didn't find it. She didn't look for the evidence. So I would respectfully ask that the decision be affirmed. Thank you. Thank you very much. Mr. Olson. A couple of points. One is the interesting question of what's the standard for whether retaliatory conduct that doesn't create a material alteration like a termination or a demotion is sufficiently severe to be actionable. Is it the standard of Burlington Northern, severe enough to deter a reasonable person from protected activity, or is it the sexual harassment standard, severe enough to alter the terms and conditions of your employment? I think it's the Burlington Northern standard because the statutory language prohibits retaliatory threats. And if you just come up to an employee and you say, if you keep harping on this tariff issue, you're out the door, that's a retaliatory threat, probably sufficient to deter a reasonable person, probably actionable, but not sufficient to alter the terms and conditions of employment. But really, either standard you pick, it doesn't matter. Because if you're in the area where she maybe satisfies one standard but not the other, you've got to let a jury decide that. Second point. Actually, we decide a lot of cases on summary judgment. Retaliation and hostile environment claims. It's a question of sufficiency. I don't think that... I think we'd look a long time before we found a case that said you wouldn't get summary judgment if you had the deter a reasonable person standard. You could have a trial on that one. But the defense gets summary judgment because we're applying the alteration in terms and conditions of employment standards. So the legal standard really does matter. I don't know. It does, but it's so close a question that it has to be determined by a jury, I think. Mr. Olson, did this country of origin question ever get resolved either inside or outside the whistleblower context for this company? Not that I know of. Second point. A reasonable jury could conclude that the whole performance improvement plan was a sham and that the decision to terminate LAM was already known to Oliver Youngbluth back before Oliver made his slip of the tongue in November and said you won't be here in five years. The fact that the performance improvement plan wasn't designed to improve anybody's performance is shown in part by the fact that they didn't follow through with the 30-60 day evaluations they were promising. If you were really going to do a plan, that's what you do. Thank you. Thank you very much. Our thanks to both counsel. The case is taken under advisement.